**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ACTIVEHOURS, INC. (d/b/a EarnIn),

Plaintiff,

v.

ANTHONY G. BROWN, *in his official capacity as the Attorney General of the State of Maryland;* ANTONIO P. SALAZAR, *in his official capacity as the Commissioner of Financial Regulation for the State of Maryland*,

Defendants.

Case No. ______________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Activehours, Inc. d/b/a EarnIn ("EarnIn"), by and through its undersigned attorneys, brings the following action under (i) the First Amendment of the Constitution of the United States of America, (ii) the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States of America, (iii) the Civil Rights Act of 1871 (42 U.S.C. § 1983), and (iv) the Declaratory Judgment Act (28 U.S.C. §§ 2201–02).

## INTRODUCTION

1. Earned wage access ("EWA") products are an innovative response to a familiar problem in American financial life: workers often earn wages days or weeks before payday, but cannot use those wages when bills, medical expenses, car repairs, or other urgent needs arise. To bridge that gap, EWA products allow workers to access a portion of wages they have already earned, meaning individuals do not need to resort to payday loans, overdraft fees, or revolving credit card debt to cover short-term expenses. In that way, EWA products provide workers with a

practical, low-cost tool for managing the timing mismatch between when they earn money and when they need it.

2. EarnIn offers a set of products and services in Maryland and around the country, including a payroll platform used by small businesses, EWA, and automated savings, among other financial wellness products. Through its leading product, Cash Out, EarnIn allows workers to access a portion of their earned but unpaid wages before payday. There is no mandatory fee to obtain a Cash Out from EarnIn and because EarnIn has explicitly disclaimed any legal right to collect outstanding funds, there is no credit, financial, or legal risk to the customer. EarnIn offers Cash Out transfers at standard speed (1–2 business days) at no charge. If an EarnIn customer chooses a faster transfer speed (30 minutes or less), they pay a small, clearly disclosed fee for the expedited service. In addition, no matter which speed they choose, EarnIn asks customers to include a tip as part of their transaction to support EarnIn's mission of offering low and no cost, easy-access EWA products to millions of workers. Many EarnIn customers choose to tip; likewise, many customers decline the voluntary tip option without any impact to their Cash Out experience. Customers who take a Cash Out authorize EarnIn to debit their linked bank account on their expected payday. Customers can revoke that authorization at any time without penalty – revoking debit authorization may make a customer ineligible for future Cash Outs (at least temporarily), but does not result in any fee, interest, or charge of any kind (that is, no reconnection/restoration charge, premium, late payment penalty, collection costs, administrative charge or other punitive expense).

3. No Maryland statutes directly regulated EWA products until 2025. At first, the 2025 statute adopted a regulatory framework that recognized the voluntary nature of tips in the earned wage access context and required appropriate disclosures. That framework defined a tip as

a payment made solely at the worker's discretion, and the statute required EWA providers to give clear disclosures that tipping was optional and not a condition of receiving service.

4. But just one year later, Maryland abandoned that tailored regime and passed a second statute that flatly banned EWA providers from soliciting tips. Senate Bill 94 ("SB 94")—which took effect on October 1, 2026—targets earned wage access providers and forbids them from engaging in constitutionally protected speech: the solicitation of tips from users of their service who want to support the endeavor. SB 94 then further compels EWA providers to expressly state that they are barred from "soliciting or retaining tips." No other Maryland law targets a specific industry by compelling this kind of speech or by prohibiting the mere request for a voluntary tip or donation. And by stating that EWA providers are prohibited from accepting or retaining tips, the law also imposes a blanket ban on the expressive conduct of Maryland workers to provide tips.

5. SB 94 is a content- and speaker-based restriction on protected speech that violates the First Amendment. EarnIn's tip solicitations communicate a truthful, non-misleading message: that optional tips help support EarnIn's mission of providing workers access to their own earned wages without mandatory fees or interest. Maryland has sought to silence that message because it disfavors the speaker and the voluntary-tipping model that helps to support EarnIn's ability to provide its services.

6. Maryland's efforts to punish the EWA industry do not stop there. The 2025 statute regulating EWA products also required EWA providers to obtain a lending license from Maryland's Office of Financial Regulation ("OFR"). But when EarnIn complied and submitted a complete application for a license, OFR held the license hostage, refusing to issue EarnIn the license unless EarnIn refunded previously-accepted tips and accounted for supposed pre-2025

violations of the Maryland Consumer Lending Law ("MCLL")—including by paying millions in civil penalties—even though the MCLL did not apply to EarnIn and EarnIn was not required to obtain a lending license before 2025. In other words, Maryland has conditioned licensure on EarnIn's payment of penalties for soliciting tips and engaging in pre-statute conduct that Maryland had never lawfully prohibited and that did not require a lending license when undertaken.

7. OFR's demands that EarnIn account for pre-2025 violations of the MCLL are meritless as a matter of law. EarnIn's Cash Out product was never a loan under the pre-amendment MCLL. Cash Out transactions are non-recourse: workers have no legal obligation to repay; EarnIn has no legal or contractual claim or remedy if workers do not repay and does not engage in debt collection activity under Maryland law; and EarnIn does not charge interest, late fees, or mandatory finance charges.

8. EWA providers and the millions of customers who use their platforms are engaging in an alternative business model that aids the most financially vulnerable Americans between paychecks. Maryland's efforts targeting the EWA industry are unconstitutional and must be enjoined.

## PARTIES

9. Plaintiff EarnIn is a Delaware corporation with its principal place of business in Mountain View, California. EarnIn is a financial services company that offers EWA and other financial services products to salaried and hourly workers. EarnIn currently serves workers in 49 states with its Cash Out and other products, including over 100,000 workers in the State of Maryland.

10. Defendant Anthony G. Brown is the Attorney General of the State of Maryland and the chief executive of the Office of the Attorney General of the State of Maryland. He is tasked

with enforcing Maryland law. The Attorney General's address is 200 St. Paul Place, Baltimore, MD 21202. Attorney General Brown is sued exclusively in his official capacity.

11. Defendant Antonio P. Salazar is the Commissioner of Financial Regulation for the State of Maryland. As Commissioner, Mr. Salazar is responsible for OFR, which is Maryland's consumer financial protection agency and financial regulator and is responsible for licensing and enforcing Maryland's laws and regulations relating to financial institutions and financial service providers. OFR is part of Maryland's Department of Labor, which is headquartered at 100 S. Charles Street, Tower I, Baltimore, MD 21201. Commissioner Salazar is sued exclusively in his official capacity.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which gives district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

13. This Court has personal jurisdiction over each Defendant because each Defendant resides in the State of Maryland and is an officer of the State of Maryland such that each Defendant is at home in Maryland, and this action relates to acts or omissions by Defendants that took place in Maryland.

14. Venue is proper in this Court because one or more of the Defendants reside in this district, all Defendants reside in the State of Maryland, and because a substantial part of the events or omissions giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(b)(1), (b)(2).

## STATEMENT OF FACTS

### I. The Earned Wage Access Industry

15. Millions of Americans face difficulties paying their bills because of an absence of liquidity between paychecks. Others are constrained in building savings or investing due to that

absence of liquidity. The standard American pay cycle forces workers to accrue wages for fourteen days, or in the case of monthly-paid employees, up to thirty-one days, before receiving compensation for labor already performed.

16. During this period, the wages legally owed to these workers remain inaccessible, locked within payroll systems that operate on schedules designed for administrative convenience rather than employees' needs. In effect, workers give employers a no-interest loan for these earned wages. The result is a persistent and structural liquidity gap that leaves working Americans without the cash necessary to meet their financial obligations, even though they have already earned the money to cover them.

17. Unexpected or poorly timed bills can place extraordinary financial pressure on workers who lack readily available funds between paydays. A sudden car repair, an unanticipated medical expense, or a utility bill that becomes due before the next paycheck can transform a routine financial challenge into an acute crisis.

18. Historically, workers facing these shortfalls have had few viable options: costly bank overdraft programs, expensive revolving credit card debt, or predatory payday loans. Each of these alternatives exacts a punitive cost from the workers who can least afford to bear it.

19. For example, based on 2024 data, bank overdraft fees are an average of about $27.08 per overdraft incident, totaling roughly $60 to $75 per U.S. household annually; and household bill late fees average $173 per year per household.[1] A 2026 report notes that the typical credit card late fee is approximately $32 per missed payment, with lower credit score holders incurring an average of 3.7 late fees annually. Payday lenders typically charge fees of $10-30 per

[1] https://www.businesswire.com/news/home/20241212974520/en/Average-U.S.-Household-Pays-%241495-a-Year-in-Hidden-Costs-Associated-With-Paying-Bills-up-18-Year-over-Year; https://www.bankrate.com/banking/checking/what-is-an-overdraft-fee/

$100 borrowed, resulting in an average APR of approximately 391%.[2] As a result, most payday loan borrowers end up paying more in fees than they originally received in credit.[3]

20. The scope of this problem is staggering. The Federal Reserve's *Report on the Economic Well-Being of U.S. Households in 2024* found that 37 percent of American adults—approximately 98 million people—could not cover a hypothetical $400 emergency expense exclusively with cash or its equivalent.[4] The Consumer Financial Protection Bureau's *Making Ends Meet* survey separately found that 40 to 50 percent of respondents who fell behind on bills said that the timing mismatch between payday and billing dates was an "important factor."[5]

21. The EWA industry emerged as a response to this structural liquidity crisis. EWA programs allow workers to access accrued wages, wages they have already earned—without borrowing—before their scheduled payday. Unlike payday loans that are made in anticipation of future earnings from both performed and unperformed work, EWA addresses the timing mismatch by aligning wage availability for performed work with the actual demands in workers' financial lives.

22. There are also other benefits to EWA. In a paper written by Professor Jonathan M.V. Davis, looking at 2024 data related to over 1 million EarnIn users, results showed that net monthly income rose $333.76 (with a standard error of $27.09) for first-time EarnIn users, an 11.5% increase against the comparison group's mean of $2,908.78.[6]

---

[2] https://www.stlouisfed.org/open-vault/2019/july/how-payday-loans-work.

[3] https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-down-the-drain-paydayloanfees-feb2025.pdf.

[4] https://www.federalreserve.gov/publications/2025-economic-well-being-of-us-households-in-2024-savings-and-investments.htm.

[5] https://files.consumerfinance.gov/f/documents/bcfp_consumer-insights-paying-bills_report.pdf.

[6] *See* Jonathan M.V. Davis, *The Impacts of Earned Wage Access: How Giving Workers More Control Over Pay Timing Can Increase Income and Boost Financial Stability* (Univ. of Oregon, Nov. 2025), https://assets.ctfassets.net/9bmss1jcvj9u/5EJKZ88JUrOs3pDQHmoIs9/0f27191ba836ae29c0ae7a453e2821b2/Davis_Impacts_of_Earned_Wage_Access_2025_Final.pdf.

23. There are two kinds of EWA providers: employer-based and direct-to-consumer. Under the employer-based model, EWA companies provide employees with EWA products based on their access to the employer's or payroll service provider's time management and/or payroll software. Direct-to-consumer EWA providers, like EarnIn, contract directly with the worker to provide EWA, rather than through an employer or payroll service provider. Direct-to-consumer EWA providers are critical for the millions of American workers whose employers do not offer employer-based EWA programs.

24. EWA providers like EarnIn extend real-time wages to employees who would otherwise have no alternative to high-cost credit products. Like other responsible EWA providers, ***EarnIn provides an avenue for workers to obtain funds without a fee and without interest or late fees;*** and using EarnIn does not affect a worker's credit score. Responsible EWA providers, including EarnIn, charge $0 in transaction and service fees for wages delivered by standard bank transfer (i.e., within 1-2 business days)—and have advocated for legislation that includes this as a requirement and for licensure or registration in the states that have enacted EWA-specific laws. For workers who wish to receive their wages faster, some EWA providers, including EarnIn, will charge an optional fee for expedited transfers.[7] In fact, user-paid expedited transfer fees are widespread among employer-based and direct-to-consumer EWA business models and are ubiquitous among nearly all sectors of modern consumer financial services.[8] The CFPB estimated that among the EWA companies that collect payments, the average cost per transaction ranged from $0.61 to $4.70.[9] At these low-cost numbers, EWA providers help workers manage liquidity

[7] https://www.earnin.com/privacyandterms/terms-of-service/fees.

[8] *See* S.Hrg. 117-624, "Examining Overdraft Fees and Their Effects on Working Families" (May 4, 2022), https://www.congress.gov/event/117th-congress/senate-event/LC72776/text.

[9] CFPB, "Data Spotlight: Developments in the Paycheck Advance Market" (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/#key-findings. In addition, over the past few years the CFPB issued rules establishing a presumptive $5 cap on overdraft fees charged by large banks, and an $8 limit on credit card late fees. Both rules were subsequently

without resorting to other alternatives that are less favorable to workers, such as payday loans, credit cards, overdraft fees, late fees, or missing payments on household bills and debt.

25. Several EWA providers, including EarnIn, are able to provide these favorable terms for workers because they are funded in part through voluntary tips that they solicit from their users. In fact, EarnIn's sole source of revenue until it started testing expedited transfer fees in 2021 was from voluntary tips provided by its customers. Employer-based EWA providers may be funded in a variety of ways. Most offer their software to corporations for free or at a low cost, and some may rely on company-paid fees,[10] employee-paid expedited transfer fees, and sometimes employee-paid subscription fees, and interchange fees. Some direct-to-consumer EWA providers like EarnIn rely on expedited transfer fees and tips, while others rely on expedited transfer fees and subscription fees. The tipping model provides a purely voluntary, inexpensive, low-barrier liquidity mechanism for millions of workers to avoid incurring mandatory fees, interest, late fees, or other fees that are less favorable to workers—especially those who are completely locked out of the traditional banking system.

26. The EWA market reflects significant and growing consumer demand for alternatives to predatory credit. Survey data confirms that this market has grown rapidly because workers want and need access to earned wages on demand. According to a survey conducted by the Financial Technology Association ("FTA"), more than 67% of employees surveyed believe

overturned (in one case by Congress, and in the other case through litigation) but it is worth noting that those fee caps were significantly higher than what EarnIn customers pay for Cash Out. CFPB, "Overdraft Lending: Very Large Financial Institutions Final Rule" (Dec. 12, 2024) https://www.consumerfinance.gov/rules-policy/final-rules/overdraft-lending-very-large-financial-institutions-final-rule/; CFPB, "Credit Card Penalty Fees Final Rule" (Mar. 5, 2025) https://www.consumerfinance.gov/rules-policy/final-rules/credit-card-penalty-fees-final-rule/.

[10] CFPB, "Data Spotlight: Developments in the Paycheck Advance Market" (July 18, 2024), ("Few employers cover the cost of earned wage products on behalf of their workers. We estimate that employers in our sample subsidized less than 5% of total fees.").

the traditional bi-weekly pay period is outdated,[11] and 43% of those employees who have employers that offer EWA products use EWA—with 75% of those users accessing EWA at least once per month.[12]

27. The CFPB's 2024 Data Spotlight estimated that, in 2022 alone, approximately 10 million workers utilized EWA products—including both employer-based and direct-to-consumer services—to access upwards of $31.9 billion in earned wages before their scheduled paydays.[13] Recent industry estimates project that the EWA market will expand by approximately 300% between 2024 and 2034, driven by increasing employer adoption, workforce demand for financial flexibility, and the proliferation of real-time payment infrastructure.[14]

28. These figures demonstrate what is obvious to any impartial observer: EWA is not a fringe product exploiting vulnerable workers, but an innovative financial tool addressing a widely recognized structural failure of the American payroll system. EWA providers, including EarnIn, offer workers flexibility and opportunity: they can access their earned wages when *they* need them, rather than waiting for a pay cycle that is timed to serve employer convenience, not worker financial health.[15]

29. In December 2025, the Consumer Financial Protection Bureau issued an advisory opinion confirming that EWA "has emerged as an innovative way for workers to meet short-term liquidity needs that arise between paychecks without turning to potentially more costly

---

[11] https://www.ftassociation.org/new-survey-shows-2-in-3-american-workers-believe-traditional-pay-period-is-outdated/.

[12] https://www.kansascityfed.org/documents/10170/PaymentsSystemResearchBriefing24Bradford0515.pdf.

[13] https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

[14] Truth in Lending (Regulation Z); Non-application to Earned Wage Access Products, 90 Fed. Reg. 60,069, 60,070 (Dec. 23, 2025), available at https://www.govinfo.gov/content/pkg/FR-2025-12-23/pdf/2025-23735.pdf.

[15] FTA Comment Letter to CFPB re: 2024 Paycheck Advance Interpretive Rule (Aug. 30, 2024), at 2–3 (citing SWNS Digital survey, Mar. 18, 2024; Financial Health Network, "Exploring Earned Wage Access as a Liquidity Solution" (2023), available at https://finhealthnetwork.org/wp-content/uploads/2023/12/EWA-Users-Report-2023.pdf).

alternatives."[16] The CFPB concluded that Covered EWA "is not credit" under Regulation Z because it "resembles early wage payment and does not resemble an extension of credit"; the worker is "in effect, only using the [worker's] own money."[17]

30. The CFPB further concluded that, "in the normal course, fees for expedited delivery of earned wages and tips for the receipt of earned wages are not finance charges because they are not imposed directly or indirectly by the provider."[18] Specifically, the Bureau affirmed that "it is inherent in the meaning of 'tip' that it is not imposed, even if providing one is considered customary" and that "a bona fide tip provided by the consumer for EWA services cannot be a finance charge."[19] The CFPB recognized that "[t]ipping is a longstanding, familiar aspect of the retail services economy" and that voluntary gratuities in the EWA context are no different in character from tips in any other service relationship.[20]

31. In issuing this advisory opinion, the CFPB formally withdrew its non-binding 2024 Proposed Interpretive Rule, which would have classified all EWA as credit and tips as finance charges, and "officially rejected the interpretations advanced in it."[21] The CFPB's 2024 EWA Proposed Interpretive Rule drew about 150,000 comments — the CFPB counted 37 from industry, 15 from consumer groups, 10 from government officials, and the balance from individual workers, the bulk generated by provider-organized campaigns urging the CFPB not to treat EWA as credit. That volume dwarfs the CFPB's other interpretive-rule dockets: 42 comments on the 2024 BNPL interpretive rule and 115 on the 2025 emerging-payments proposal.[22] In the 2025 Advisory

---

[16] 90 Fed. Reg. at 60,069.
[17] *Id.* at 60,072.
[18] *Id*. at 60,074.
[19] *Id*. at 60,076.
[20] *Id*. at 60,075.
[21] *Id.* at n. 81.
[22] Sourced via regulations.gov docket on 8/19/26. The CFPB's own breakdown is in footnote 22 of the December 2025 Advisory Opinion.

Opinion, the CFPB also observed that "most States to have specifically considered EWA legislatively do not regulate EWA as credit," citing statutes in Kansas, Missouri, South Carolina, and Utah that expressly provide that EWA services are not loans or credit.[23]

## II. EarnIn's Business Model and Operations in Maryland

### A. EarnIn's Mission is to Help Workers

32. EarnIn was founded in 2013 with the mission of empowering workers and addressing inequality in the financial system. When the company started, Founder and CEO Ram Palaniappan had to decide whether to make it a for-profit or non-profit enterprise. He witnessed the 2008 financial crisis, a time when more people needed help from non-profit services and yet non-profit organizations had fewer resources with which to help because their primary funding sources severely dried up. Thus, he decided on a for-profit model for EarnIn, expecting that model to be more resilient and better able to help people regardless of the economic climate. In doing so, Palaniappan kept the non-profit model of voluntary payments, but asked those who were benefitting from the service if they would provide tips. The company thus ran only on tips for a long time. The seeds of the company's formation came from Palaniappan's personal experience, where he witnessed how some of his colleagues struggled with bills that came between paychecks even though they had already earned the money to pay those bills. Palaniappan did what he could personally and gave them financial support to tide them over. But he realized there is a significant need for financial solutions to help people bridge the gap between paychecks. Out of that experience, EarnIn was born.

33. EarnIn creates and offers products to meet the needs of workers across America. Cash Out helps workers who live paycheck-to-paycheck and helps workers as a cash-flow

---

[23] *Id*. at 60,073 & n.50.

management and cost-avoidance tool. It helps workers smooth timing, avoid more expensive liquidity options, and preserve flexibility for both routine expenses and work-related opportunities. More specifically, Cash Out helps workers by: avoiding higher-cost alternatives like late fees on bills, overdraft fees, payday loans, and credit cards; improving outcomes over time, as longer-tenured EarnIn users are less likely to incur overdraft fees, credit card fees, or use payday loans; covering ordinary timing gaps for recurring expenses such as food/groceries, gas/transport, and utility bills; serving as a lower-friction alternative to other cash sources; and supporting work and mobility in some cases. Other products provided or serviced by EarnIn or its subsidiaries that help workers include its payroll platform; Early Pay, which allows workers to get paid up to two days early; Live Pay, where instead of earnings updating daily, they rise every second of the workday, available immediately on the EarnIn Card (a bank-issued charge card serviced by an EarnIn company); Balance Shield, which helps people avoid overdrafting their bank account; Credit Monitoring, to help people monitor their credit score; and Tip Yourself, which lets workers set aside/save money for goals, expenses, or rainy days through the EarnIn app.

**B. How EarnIn's EWA Product Works**

34. Most EarnIn users download the EarnIn mobile application, either from the Apple App Store or Google Play Store. Once they have done so, they are walked through steps to create an account, including identifying an employer and linking a bank account into which EarnIn will deposit the Cash Out amount.

35. The home page of the EarnIn App demonstrates the multi-faceted approach the application takes to support workers' financial health. In addition to the Cash Out function, which allows users to obtain unpaid earnings, the home screen displays when the next payday is and indicates how much unpaid earnings the worker can access. The home screen also includes an option to activate EarnIn's Balance Shield service and offers a credit-monitoring tool.




EarnIn Home Page on iPhone Mobile Application.

36. EarnIn's flagship EWA product, "Cash Out," allows workers to access a portion of their earned wages before their scheduled payday. When a customer creates an EarnIn account, the customer authorizes EarnIn to connect to their bank account.

37. This access allows EarnIn to review employment-related direct deposit history, verify employment, and estimate expected take-home pay. EarnIn does not obtain credit histories and does not conduct credit checks.

38. Once EarnIn verifies hours worked, it makes available a Cash Out disbursement of a portion of the worker's earned, but unpaid, wages. The disbursement is subject to applicable limits disclosed prominently on EarnIn's website, app, and in the customer's EarnIn account.







EarnIn Cash Out Withdrawal Selection Page on iPhone Mobile Application.

39. Workers conducting Cash Out transactions are accessing funds to which they are already entitled, rather than borrowing money—because there is no obligation to repay and there are no mandatory fees and no interest charged. Indeed, the only fees that EarnIn collects are optional, and solely for the expedited delivery of the requested funds. That aspect of the model is analogous to Venmo or Cash App, where users are given the option to choose between a free standard transfer or a paid expedited option, with any fee tied solely to the speed or method of delivery—not access to the underlying funds. These optional, convenience-based fees are widely understood by users and reflect a delivery preference rather than compensation for credit.

40. EarnIn's ability to solicit voluntary tips is critical to its ability to offer its services. By providing its users the option to tip, EarnIn and its customers work together, to share and distribute the cost of accessing a platform that provides access to inter-paycheck liquidity without

the high fees and interest charged by payday lenders. EarnIn realized that users would be willing to voluntarily contribute at frequencies and scale sufficient to support a platform that services millions of workers; and it built a business model on that understanding. The vision to imagine users voluntarily sharing the cost to provide an alternative to the usurious and predatory payday lending model was nothing short of revolutionary.




EarnIn Cash Out Tip Pages on iPhone Mobile Application.

41. In most states, users have the option to pay a voluntary tip at the time they obtain a Cash Out.[24] In states where it offers a tip option, EarnIn clearly explains the purpose of the voluntary tip: to support the ability of EarnIn to offer Cash Out on an interest- and fee-free basis.

[24] As noted in ¶ 86 below, under pressure from the Defendants in this case, EarnIn removed the tipping feature for Maryland customers in 2025. Should the relief that EarnIn seeks in this lawsuit be granted, however, EarnIn intends to resume soliciting tips from Maryland users of its service in the same way that it does in other states without the ban on solicitation. *See* ¶ 109. EarnIn has removed the tipping feature in 3 other states, also under pressure from government entities in those states.

EarnIn is upfront that the tips are entirely optional. “Tipping is always your choice and never affects your service.” “They don’t impact the quality and availability of services.” EarnIn also communicates that the purpose of tipping is to help support EarnIn’s mission: “We believe customers should have access to their pay (without mandatory fees) whenever they need it. Optional tips make that possible.”

42. Where EarnIn does charge fees, it is careful to distinguish between those and the voluntary tips. And if any EarnIn customer mistakenly adds a tip, EarnIn will refund it:

> **You are not required to pay any fees or charges to use any of the Cash Out Services, however, additional fees may apply to use Lightning Speed.** You may choose to pay a voluntary gratuity (a **"tip"**) when you elect to obtain a Cash Out. **Payment of a tip is completely optional.** Payment or non-payment of a tip will not affect your eligibility to participate in the Cash Out Services and will not affect the size of any Cash Out you receive. Any tip that you provide will be debited from your Bank Account when you repay the Cash Out. **EarnIn will refund a tip if you request a refund within 30 days of repayment of a Cash Out. To request a refund for a tip, please live chat with the EarnIn team through the *EarnIn App*.** These voluntary tips help fund EarnIn and keep EarnIn going, but EarnIn wants you to be in control of whether or not you tip and, if you choose to tip, the amount you tip.

*Cash Out User Agreement*, EarnIn, https://www.earnin.com/privacyandterms/cash-out/terms-of-service (last visited October 20, 2026).

43. The phrasing of these communications is intentional. EarnIn’s mission is to help people achieve income flexibility through an innovative financial product. The workers who use the EarnIn platform understand that mission and by tipping they demonstrate their support for the same mission and platform that helped them when they needed it.[25]

44. Once customers select the amount of their unpaid earnings to access, the speed at which they want the Cash Out to be transferred, and a tip amount (which can be $0), the transaction is complete. EarnIn deposits funds directly into the customer’s bank account either via standard

[25] Both tipping and the Lightning Speed Fee for expedited delivery are entirely optional and fully within the worker’s discretion. Workers may, and often do, receive Cash Outs for free.

ACH transfer at no cost (1–2 business days) or, at the customer's election, via an expedited transfer for a nominal fee of $4.99–$6.99 in most states ("Lightning Speed Fee") (within 30 minutes).[26]




EarnIn Cash Out Transfer Confirmation Pages on iPhone Mobile Application.

### C. EarnIn's EWA Products Are Not Credit Products

45. Cash Out is not a loan or credit product. The defining features of Cash Out—and the features that fundamentally distinguish it from any lending product—is that Cash Out disbursements need not be repaid and, if they are not, there is no recourse against the customer.

46. When customers conduct a Cash Out transaction, they authorize EarnIn to debit

[26] https://www.earnin.com/privacyandterms/terms-of-service/fees. There is a different fee schedule for Tipless Earnings Access (TEA) states such as Colorado and Wisconsin: https://help.earnin.com/hc/en-us/articles/42795768735891-How-Cash-Out-and-Balance-Shield-Fees-Work-in-CO-and-WI. And Indiana, Florida, and New York have percentage-based Lightning Speed fees: https://help.earnin.com/hc/en-us/articles/43839807986451-Indiana-Florida-and-New-York-residents-Lightning-Speed-fees. Lightning Speed fees were often less than $4.99 in the past. And, when EarnIn consumers use certain other services offered or serviced by EarnIn or one of its subsidiaries today, their Lightning Speed fees may be as low as $2.99.

their linked bank account on payday for the amount disbursed plus any voluntarily selected fees and tips. However, customers may cancel their debit authorization by simply emailing EarnIn or using the in-app chat function prior to EarnIn initiating the debit—with no penalties.[27] Customers can also reschedule their repayment to their next payday with no cost or penalty.

47. EarnIn prominently and explicitly disclaims any legal rights to recover unreimbursed disbursements in its Cash Out User Agreement, which states in bolded text: "**You do not have an obligation to repay any of the Cash Out Services, and EarnIn will have no legal or contractual claim or remedy against you based on your failure to repay any of the Cash Out Services.**"[28] Based on EarnIn's own contract terms, customers have no legal obligation to repay EarnIn for any Cash Out, and EarnIn has no right to, and does not, enforce repayment.



1/30/26, 4:53 PM Cash Out User Agreement | EarnIn

# Cash Out User Agreement

Effective date: January 30, 2026

Welcome to EarnIn! This Cash Out User Agreement (this **"Agreement"**) constitutes a legal agreement between you and Activehours, Inc., d/b/a EarnIn (**"EarnIn"**) governing your use of EarnIn's "Cash Out," "Lightning Speed," and "Balance Shield" products, services, and features, including the "Transfer Out" button (collectively, the **"Cash Out Services"**).

## Table of Contents


- ACCEPTANCE OF TERMS
- THE CASH OUT SERVICES
  1. Overview of Cash Outs.
  2. Eligibility
  3. Receipt of Cash Outs; Lightning Speed.
  4. Cash Out Maxes.
  5. Max Boost.
  6. Balance Shield; Balance Shield Transfers.
  7. No Fees; Tips.
  8. Repayment; No Obligation to Repay
- YOUR USE OF THE CASH OUT SERVICES
- CANCELLATION
  1. Cancellation By You.
  2. Termination or Suspension by EarnIn.
- CONTACTING EARNIN
- NOTICE TO CALIFORNIA CUSTOMERS


## ACCEPTANCE OF TERMS

Please read this Agreement carefully before using the Cash Out Services. This Agreement replaces any previous agreement you may

https://www.earnin.com/privacyandterms/cash-out/terms-of-service 1/7



1/30/26, 4:53 PM Cash Out User Agreement | EarnIn

**You are not required to pay any fees or charges to use any of the Cash Out Services, however, additional fees may apply to use Lightning Speed.** You may choose to pay a voluntary gratuity (a **"tip"**) when you elect to obtain a Cash Out. **Payment of a tip is completely optional.** Payment or non-payment of a tip will not affect your eligibility to participate in the Cash Out Services and will not affect the size of any Cash Out you receive. Any tip that you provide will be debited from your Bank Account when you repay the Cash Out. **EarnIn will refund a tip if you request a refund within 30 days of repayment of a Cash Out. To request a refund for a tip, please live chat with the EarnIn team through the *EarnIn App*.** These voluntary tips help fund EarnIn and keep EarnIn going, but EarnIn wants you to be in control of whether or not you tip and, if you choose to tip, the amount you tip.

8. **Repayment; No Obligation to Repay.**

As stated in Section 2.a., to obtain Cash Outs and utilize the other Cash Out Services, you must have a checking account at a bank located within the United States and you must link that bank account to your EarnIn profile. To repay Cash Out Services, you must authorize: (1) debits from your Bank Account or other eligible bank account, (2) debits from deposit account opened with our banking partner, and (3) if you're on EarnIn Payroll, your employer and/or its designated payroll service provider to disburse a portion of your net wages to EarnIn as payment for services provided to you by EarnIn. Your bank account(s) are subject to the terms of the applicable deposit account agreement(s) you enter into with each bank.

**You do not have an obligation to repay any of the Cash Out Services, and EarnIn will have no legal or contractual claim or remedy against you based on your failure to repay any of the Cash Out Services. However, if you do not repay a Cash Out Service or EarnIn is unable to complete a repayment to EarnIn that you authorized, you will be prevented from using the Cash Out Services until you pay any outstanding authorized payment to EarnIn.** EarnIn warrants that it will not (i) engage in any debt collection activities if Cash Out Services are not repaid on the scheduled date, (ii) place the amount of the outstanding Cash Out Services as a debt with, or sell it to, a third party, or (iii) provide any reporting to a consumer reporting agency concerning the amount of the Cash Out Services.

## YOUR USE OF THE CASH OUT SERVICES

https://www.earnin.com/privacyandterms/cash-out/terms-of-service 5/7

Excerpts from the Cash Out User Agreement.

[27] Based on banking cut-off times, if a customer revokes their debit authorization within three business days of the scheduled repayment date, EarnIn may not be able to cancel the transaction. This timing limitation is clearly disclosed: https://help.earnin.com/hc/en-us/articles/360037506833-How-do-I-revoke-bank-authorization-from-EarnIn.

[28] https://www.earnin.com/privacyandterms/cash-out/terms-of-service.

48. In addition, if a customer had any doubt, they could use the "Chat" function to speak with an EarnIn customer service representative, who will again confirm that Cash Out is (1) non-recourse and (2) that tipping is optional.




Chat with EarnIn Customer Service Representative.

49. This non-recourse structure is not incidental or accidental—it is a fundamental feature of the product's architecture. EarnIn designed Cash Out to operate differently from a loan—not to circumvent the law, but to benefit workers by creating a product whose features are distinct from loan and credit products in their most essential and impactful ways.

50. Unlike a payday lender, EarnIn cannot—and does not—bring court actions, report to credit bureaus, file bankruptcy claims, sell debts, garnish wages, or pursue litigation or arbitration to collect outstanding Cash Out disbursements.

51. Unlike a traditional bank overdraft program, Cash Out does not create a bank liability that can result in account closure or cascading fees.

52. Unlike a traditional credit card, Cash Out does not create a revolving balance, accrue interest, or affect a user's credit utilization ratio.

53. In the traditional sense, the worker who uses Cash Out is not a borrower—they are simply obtaining early access to a portion of the wages they have already earned. In the same way, because EarnIn has no legally enforceable right to repayment, Cash Outs are not "credit" in a legally cognizable sense.[29]

54. If the customer's linked bank account lacks sufficient funds on payday, or if a customer revokes their debit authorization, EarnIn—and EarnIn alone—absorbs the loss. EarnIn does not impose any penalties or fees for the non-reimbursement of outstanding sums and does not engage in collections activities because it expressly disclaims any legal obligation to those funds.

55. Moreover, because EWA transactions are interest-free, the outstanding amount does not increase over time. For example, if a customer chooses to repay a $100 Cash Out at any time after their scheduled payday, the repayment amount will remain $100 whether it is repaid 2 weeks later, 2 months later, or 2 years later.

56. In the event a user does not repay EarnIn, EarnIn will merely pause the customer's access to additional Cash Outs until the outstanding amount is repaid, if ever.

57. This approach supports responsible use of EWA. Maryland customers may restore their access to Cash Out at any point by repaying the previous amounts disbursed to them, plus

---

[29] EarnIn acknowledges that, after HB 1294 took effect on October 1, 2025, EWA was expressly included within the statutory definition of "loan" in Maryland, subject to Subtitle 15, notwithstanding the absence of essential characteristics of a "loan" or "credit," although licensed EWA providers were exempted under the law "from other provisions of State law governing lending, credit, or debt." Md. Code Ann., Com. Law §§ 12-1501(j)(2), 12-1502(c).

any Lightning Speed fees they selected, with no additional fees, penalties, or accrued interest. There is no scenario where a Maryland Cash Out customer ever repays more than the disbursed amount, plus any optional Lightning Speed Fee they chose to incur.

58. This distinction between EWA and credit products has material, real-world benefits for Maryland workers. Credit alternatives carry downstream risks that are absent in EarnIn's EWA product. For instance, traditional bank overdraft programs—the most direct substitute for Cash Out—typically charge $35 per transaction, are often assessed without warning, and can result in cascading fees when multiple transactions overdraft the same account. Traditional bank overdraft programs can lead to involuntary account closures that may have long-term effects on consumers' access to bank services. Credit cards, another alternative, come with late fees and interest rates that may be difficult for consumers to calculate. They also can adversely affect credit scores.

59. EarnIn's Cash Out, by contrast, offers a standard ACH transfer at no cost, with no interest, no mandatory fee, no credit check, no adverse credit reporting, and no debt collection.

**D. EarnIn Helps Workers In Need**

60. In 2022, more than 1.3 million workers nationwide accessed more than $5 billion in earned wages through EarnIn's Cash Out disbursements. In 2025, more than 2.7 million users nationwide accessed about $9.6 billion in earned wages through EarnIn's Cash Out disbursements. Prior to August 2023, more than 100,000 Maryland workers received a Cash Out. In 2025 alone, 78,249 Maryland workers received a Cash Out. In all, since EarnIn began offering Cash Out in Maryland in May 2014, more than 143,000 Maryland workers have received a Cash Out.

61. In November 2023, EarnIn shared with OFR that Cash Out's structure and customer usage data demonstrate the voluntary nature of tips and fees and that customers understood how to adjust any tips or fees they chose to pay each time they did a Cash Out. These are financially savvy customers. The data showed that 28.1% of Marylanders who used Cash Out more than once

never provided a tip, that the vast majority of EarnIn's Maryland customers have tipped $0 at least once and that an even greater percentage varied their tip amounts across transactions, demonstrating that Maryland residents understand their tipping options. In Maryland, the average tip rate varied slightly across income tiers, and Marylanders who received a Cash Out tipped, on average, between 2.02% and 2.83% of their Cash Out amount, based on estimated income tiers that EarnIn shared with OFR. Among the same population, 42.7% paid the Lightning Speed Fee on some but not all transactions, and 4.5% never paid the Lightning Speed Fee. EarnIn users' average tip amount in 2022, nationally, including $0 tips, was $2.28.

62. Customer experience since EarnIn shared that 2022 data with OFR is in accord and shows a pattern of customer awareness and understanding of the voluntary nature of tips. Nationally, EarnIn data shows that users' average tip amount in 2024, including $0 tips, was $1.19, and in 2025, it was $0.92. Professor Jonathan M.V. Davis's paper looking at 2024 data related to over 1 million EarnIn users nationwide found that users left a voluntary tip in about 45% of transactions, averaging $1.25, and concluded that average voluntary customer payments were about 5% of the amount accessed.[30] These usage patterns confirm that EarnIn customers are and have been aware that tips and Lightning Speed fees were optional, exercised independent discretion over tips and Lightning Speed fees, and knew that tips and Lightning Speed fees were not imposed or required as a condition of accessing Cash Out. Simply put, the ability to obtain a Cash Out was not conditioned on tips and Lightning Speed Fees, and Marylanders knew that.

63. These usage patterns are inconsistent with the existence of "interest" or any cost "imposed" by EarnIn for the extension of credit and instead reflect customer-controlled decisions regarding optional service features.

---

[30] *Supra* note 6.

## III. Maryland's Regulation of EWA and Passage of SB 94

### A. The Pre-2025 Maryland Consumer Loan Law and Guidance

64. Lending in Maryland is primarily governed by the MCLL. Prior to October 2025, the MCLL did not expressly address EWA products. The Maryland General Assembly considered multiple bills specifically addressing EWA products between 2022 and 2024, none of which were enacted through the 2024 session. This history reflects the contested nature of EWA regulation and the absence of any clear pre-2025 statutory or legislative determination that EWA products are loans under existing Maryland law.

65. Notably, the Maryland General Assembly's Department of Legislative Services stated in 2024 that "there is no direct federal or State law on the topic of earned wage access."[31]

66. The pre-2025 MCLL prohibited businesses from making loans unless they were licensed with OFR, *see* Md. Code Ann., Com. Law § 12-302, and defined a "loan" in general terms as "any loan or advance of money or credit subject to this subtitle," Md. Code Ann., Com. Law § 12-301(f)(1) (2019).

67. Subsequent sections of the MCLL reflected an understanding that the term "loan" under § 12-301 of the MCLL generally refers to an agreement that creates an enforceable obligation that gives a provider a legal right to collect the debt if the borrower fails to repay. *See* Md. Code Ann., Com. Law § 12-308(d)(1)(i) (2018) (requiring lenders to, upon full repayment of a loan, permanently mark any documents in the lender's possession constituting "*evidence of obligation of the borrower*" as "paid" or "cancelled" (emphasis added)).

68. EarnIn began offering Cash Out in Maryland in 2014. Because a Cash Out did not—and does not—create an enforceable obligation to repay or otherwise give EarnIn a legal

[31] Maryland Department of Legislative Services, Fiscal and Policy Note for SB 998 (2024).

right to collect from a Cash Out user who chose not to repay, EarnIn reasonably understood that its Cash Out product would not be deemed a loan subject to the MCLL. Thus, EarnIn did not obtain a consumer lending license.

69. In July 2019, OFR contacted EarnIn's counsel regarding OFR's interest in EarnIn's products. EarnIn responded to the request to schedule a meeting, but OFR did not follow up, and a meeting did not occur at that time.

70. In August 2019, a multistate working group of state financial services regulators, which included OFR (the "Multistate Group"), requested information from EarnIn as part of a review of the payroll access industry.

71. EarnIn produced responsive materials to the Multistate Group through a series of six different productions, spanning August 2019 through April 2020. This multistate review concluded without any indication from Defendants that EarnIn was required to obtain a Maryland consumer lending license or was otherwise in violation of Maryland law. Nor did any other regulator that was a member of the Multistate Group indicate that EarnIn was required to obtain a consumer lending license for their respective jurisdictions.

72. On August 1, 2023—more than three years after EarnIn's final production as part of the Multistate Group's review—OFR issued Industry Advisory Regulatory Guidance entitled "Guidance on Earned Wage Access Products" (the "Guidance").[32] The Guidance distinguished between employer-provided EWA programs and independent third-party providers, the latter of which were subject to a case-by-case, "facts and circumstances" analysis to determine whether the provider is a lender required to obtain a license.

---

[32] Md. Off. of Fin. Regulation, *Guidance on Earned Wage Access Products*, at 2 (Aug. 1, 2023), https://www.dllr.state.md.us/finance/advisories/advisory-ind-earnedwageaccess.pdf.

73. For independent third-party providers, like EarnIn, the Guidance stated that whether an EWA product constitutes a loan under Maryland law depends on: (1) who bears the economic risk of default; (2) the level of contact between the EWA provider and the consumer; and (3) whether fees or tips are paid to the EWA provider.

74. OFR did not publish the Guidance in the Maryland Register, did not seek public comment, and did not follow the notice-and-comment rulemaking procedures required by the Maryland Administrative Procedure Act ("MAPA"), Md. Code Ann., State Gov't §§ 10-101 *et seq.*

75. EarnIn met with OFR representatives three times in 2023 after the release of the Guidance. At no time during or following those meetings did Defendants give EarnIn any "instruction" or written communication that the "facts and circumstances" governing EarnIn's provision of direct-to-consumer EWA products were such that licensing was necessary.

76. EarnIn contacted OFR in November 2023, following up on its prior meetings with OFR and memorializing its understanding that EarnIn's services were not subject to the licensure requirements of the MCLL. OFR never responded to this follow-up or provided any contrary indication. The next time EarnIn heard from OFR was in July 2024, when OFR issued a market inquiry to EarnIn in connection with its public investigation into EWA providers.

77. In January 2024, OFR submitted House Bill 246 ("HB 246") to the Maryland legislature. HB 246 purported, among other things, to classify EWA providers as lenders under the MCLL—demonstrating OFR's own understanding that absent further legislative action, the MCLL did not classify EWA providers as lenders or subject them to the resulting licensure requirements. This bill did not pass and did not become law.

78. But the state nonetheless continued to pursue aggressive regulation of EWA providers. Around the time OFR submitted HB 246, Assistant Attorney General Bill Meeks testified before the Maryland House Economic Matters Committee that EWA providers were "payday lenders by another name."[33]

79. In February 2024, alternative pieces of legislation, House Bill 1425 and Senate Bill 998, proposed comprehensive regulation of EWA providers, including registration requirements, clear fee disclosures, offering a no-cost option, and reimbursement for overdraft fees. EarnIn supported this legislation because it provided both meaningful protection for consumers and regulatory clarity for EWA providers who wished to operate in the state.

80. But this comprehensive regulatory scheme apparently was not aggressive enough toward EWA providers for the state. Maryland AAG Bill Meeks testified before the House Economic Matters Committee that Maryland "opposes House Bill 1425 because it exposes middle and low-income Marylanders to predatory payday lending."[34] AAG Meeks similarly testified before the Maryland Senate Finance Committee that Maryland's definition of a loan is expansive and covers EWA products.[35] OFR also urged extensive regulation of EWA providers. In March 2024, OFR sent a letter to the Senate Finance Committee stating that "[w]hile there is not yet direct federal law explicitly naming EWA products, they are likely covered by federal Regulation Z, which covers consumer loan disclosures, as well as the Truth in Lending Act."[36] And Attorney General Brown penned an editorial in the *Baltimore Sun* criticizing EWA providers.[37] He argued that "these so-called EWA advances are exorbitant loans that harm workers." He singled out an

[33] https://www.youtube.com/live/4_rzLHL4Uzw?si=29q2cCN18_1WRWWt&t=6454.
[34] https://www.youtube.com/live/3eqeI-NFtiA?si=xKK2ylSgSTqk-YQ6&t=11843.
[35] https://www.youtube.com/live/9FuolVopF-I?si=9NOp63RoiNVUng4C&t=7300.
[36] March 26, 2024 Letter to Senate Finance Committee, https://mgaleg.maryland.gov/cmte_testimony/2024/fin/1FoCxzmpmKe4_9RFisvquchRp4U5uzoN8.pdf.
[37] https://www.baltimoresun.com/2024/11/04/ag-anthony-brown-highlighting-an-alarming-threat-to-maryland-workers-guest-commentary/.

aspect of EarnIn's core business model—its practice of soliciting tips—alleging that "EWA lenders misleadingly call some of their charges 'tips' or 'donations,'" and that "[w]hile consumers are told that 'tips' are not required to get a loan, in practice consumers feel obligated to 'tip.'"

81. Following these public comments attacking EarnIn's business model, including its practice of soliciting tips, in July 2024 EarnIn received a subpoena from the Maryland Office of the Attorney General ("OAG") and a market-inquiry request from OFR, both of which sought records from EarnIn regarding, among other things, its solicitation of tips. These investigations are discussed further below. *See infra* ¶¶ 96–98.

**B. The 2025 EWA Statute**

82. After neither OFR's preferred bill (HB 246) nor the alternative legislation (HB 1425 and SB 998) was passed, Maryland legislators and stakeholders began working on a compromise. The result was House Bill 1294 (the "EWA Statute"), which established a prospective regulatory framework that balanced interests among EWA providers, OFR, and the Maryland legislature concerning the regulation of EWA products under the MCLL. In 2025, the Maryland General Assembly passed the EWA Statute, which was scheduled to take effect on October 1, 2025. The EWA Statute expressly included EWA within the statutory definition of "loan" in Maryland, but then set a distinct set of rules and procedures tailored to the EWA product. Among other reforms, the EWA Statute formalized a licensing framework for EWA providers operating in Maryland, required annual reports from EWA providers, imposed fee limits for transactions, restricted EWA providers from compelling payment through legal action, and required providers to offer at least one no-cost option for accessing earned wages. The EWA Statute permitted tipping, subject to a series of consumer protection requirements.

83. The EWA Statute defined a "tip" to mean a "voluntary payment" that is "made at the time of the transaction," "made at the sole discretion of the consumer," and "does not affect

the willingness of the lender or third party" to facilitate future transactions. *See* Md. Code Ann., Com. Law §§ 12-101(n)(1), 12-1501(n). That definition remains unchanged today.

84. The EWA Statute also established a comprehensive disclosure regime requiring EWA providers to: (i) set the default tip to zero; (ii) clearly and conspicuously disclose immediately prior to each transaction that tips did not go to any specific employee; (iii) clearly and conspicuously disclose that any tip was "optional and voluntary"; and (iv) disclose in the EWA provider's service contract that tips were voluntary and that access was not contingent on any tip. *See* Md. Code Ann., Com. Law § 12-1503(a)(9) (2025).

85. As further evidence of the tailored regulatory regime the Maryland legislature sought to implement, the EWA Statute exempted licensed "earned wage access provider[s] . . . from other provisions of State law governing lending, credit, or debt, including the provisions of Subtitle 1, Subtitle 3, Subtitle 9, and Subtitle 10 of this title." *Id.* § 12-1502(c). This distinction makes sense because the legislature took care to enact a set of regulations specific to EWA providers when it enacted the 2025 EWA Statute. *Id.* §§ 12-1501–12-1507.

**C. The 2026 Ban on Soliciting Tips**

86. Notwithstanding the EWA Statute's authorization to solicit tips, EarnIn anticipated that state regulators would continue to pursue the more aggressive regulation of EWA providers that AG Brown, AAG Meeks, and OFR had publicly sought over the preceding years. The increasingly adversarial state posture and prospects for adverse government action – based on the combined statements of Maryland state officials about EWA providers generally, together with the subpoena and market-inquiry that EarnIn received from OAG and OFR seeking records regarding EarnIn's practices of soliciting tips – created a credible threat of more punitive government action for continuing to solicit tips. Accordingly, in an attempt to safeguard operations against such hostile state action, EarnIn preemptively removed the voluntary tipping option for workers in

Maryland. This decision proved to be prescient as shortly afterward OFR introduced SB 94, which imposed a blanket ban on tips.

87. On September 30, 2025, the day before the EWA Statute took effect, OFR pre-filed SB 94, which sought, among other things, to amend §§ 12-1503 and 12-1504 to abandon the comprehensive disclosure regime that was enacted one year earlier in favor of a blanket ban on soliciting and accepting tips.

88. Following amendments proposed at the Senate Finance Committee, the Maryland Senate and House subsequently passed the bill and Governor Wes Moore signed it into law, codified as Chapter 170 of the 2026 Laws of Maryland.[38]

89. SB 94 retained licensed EWA providers' exemption from Subtitle 3 of the Commercial Law under § 12-1502(c), but added provisions prohibiting discrimination or false advertising, similar to provisions in Subtitle 3.[39] §§ 12-1507–12-1508. It also amended various provisions from the 2025 EWA Statute to ban EWA providers from soliciting or accepting tips—but in doing so distinguished between EWA providers and "lenders" generally. SB 94 amended Subtitle 15—Earned Wage Access, to state that a "provider of earned wage access may not … solicit or charge a tip." Md. Code Ann., Com. Law § 12-1504(2) (eff. Oct. 1, 2026). By contrast, the anti-tip provisions that apply to non-EWA lenders are incorporated into other subtitles of the Commercial Law Title. For instance, § 12-128, situated in Subtitle 1—Interest and Usury, states "[a] lender may not accept a tip from a consumer or give a consumer the option to provide a tip." A mirror provision is located in Subtitle 3—Consumer Loans—Credit Provisions. *See id.* § 12-

[38] https://mgaleg.maryland.gov/2026rs/Chapters_noln/CH_170_sb0094t.pdf.

[39] Notably, the original draft of SB 94 would have amended Md. Com. Law § 12-1502(c) to exempt licensed providers from Subtitle 3 "with the exception of §§ 12-304, 12-305, and 12-316.1." That amendment would have been pointless unless its drafters understood § 12-1502(c) to remove licensed providers, consumer-directed ones included, from Subtitle 3 altogether. https://mgaleg.maryland.gov/2026RS/Chapters_noln/CH_170_sb0094t.pdf.

318. The separate location of these provisions and their reference to "lenders" is consistent with § 12-1502(c), which exempts "licensed" "earned wage access provider[s] . . . from other provisions of State law governing lending, credit, or debt, including the provisions of Subtitle 1 [and] Subtitle 3." *Id.* § 12-1502(c). Based on the foregoing, EarnIn understands that as an EWA provider, it is not subject to § 12-128 or § 12-318.

90. SB 94 also compels EWA providers to "clearly and conspicuously disclose in the provider's service contract with the consumer that the provider is prohibited by law from soliciting or retaining tips, gratuities, or other donations." Md. Code Ann., Com. Law § 12-1503(a)(9) (eff. Oct. 1, 2026).

91. SB 94's tip-related restrictions replace the comprehensive disclosure regime that the General Assembly enacted one year earlier in the EWA Statute. As evidenced by its pre-filing of SB 94 the day before the EWA Statute took effect, OFR had no interest in considering whether the EWA Statute served as an effective regulation of tipping practices before it pursued its preferred blanket ban. SB 94 was also enacted before the first annual EWA provider reports were due in July 2026. As a result, SB 94's blanket ban on tipping was enacted based on pre-EWA Statute data and in the absence of information showing whether its previously enacted reforms had worked.

92. In recommending the passage of SB 94, the Consumer Protection Commission within Maryland's Office of the Attorney General justified the restriction on tipping by saying it was needed "so companies can't pressure workers to pay extra," to protect workers from "incurring hidden costs," and to facilitate "clear pricing."[40] However, the EWA Statute already ensured that workers knew any tip was "optional and voluntary," made clear that service was not contingent on

[40]https://mgaleg.maryland.gov/cmte_testimony/2026/ecm/1LluaAiZFFMfHyANVX64f5F8jSeuV9Xc5.pdf.

the payment of a tip, and established a default tip of $0 on any transactions. In light of these mandatory disclosures and consumer protections, there were no costs that were "hidden" from any workers nor any "unclear" pricing practices. Maryland thus had at hand—and the General Assembly had already enacted—multiple narrow, less restrictive measures expressly designed to protect workers from any conceivable confusion regarding the optional nature of tips on EWA products.

93. SB 94 jettisons each of the targeted, less restrictive measures in the EWA Statute and replaces them with both a flat ban on protected speech and a compelled adverse statement.

94. SB 94 prohibits EWA providers and lenders from soliciting or accepting tips, when no other classes of businesses or persons are banned from doing so under Maryland law.

95. SB 94 went into effect on October 1, 2026. As a result, EarnIn is now subject to SB 94's prohibition on soliciting tips, and is compelled to display on its platform that it is "prohibited by law from soliciting or retaining tips, gratuities, or other donations." Md. Code Ann., Com. Law § 12-1503(a)(9) (eff. Oct. 1, 2026).

**IV. Maryland Threatens Enforcement and Unlawfully Withholds EarnIn's License**

96. On July 24, 2024—after the release of the Guidance but before the EWA Statute was passed—EarnIn received a subpoena from the Maryland OAG inquiring, among other things, about EarnIn's practice of soliciting tips.

97. Two days later, on July 26, 2024, EarnIn received a separate market-inquiry request from OFR, issued in connection with OFR's public investigation of the EWA industry, that likewise sought information about EarnIn's practices, including its practice of soliciting tips.

98. On August 20, 2024, OAG attorneys met with EarnIn's counsel regarding the OAG subpoena. During that meeting, OAG took the position that certain practices of EarnIn's ongoing business in Maryland may have violated the Maryland Consumer Protection Act, and that areas of

interest included disclosures and the tip model. OAG counsel also noted that his office was in contact with the OFR but working independently.

99. EarnIn provided documents in response to the market inquiry and the subpoena showing that repayment, tips, and Lightning Speed Fees are all optional: EarnIn customers have no obligation to pay any tips or fees and therefore the tips and fees are not "imposed" by EarnIn. Throughout the investigations, EarnIn has timely responded to all information requests.

100. While the dual investigations were unfolding, Maryland enacted the EWA Statute, effective October 1, 2025, which imposed a licensing requirement on EWA providers.

101. Pursuant to the EWA Statute's licensing framework, on September 17, 2025, EarnIn submitted its complete application for licensure. On September 30, 2025, the same day the tip ban legislation was pre-filed, OFR confirmed that it was "processing [EarnIn's] application." OFR further stated that it "will refrain from taking enforcement action for licensable activity conducted between October 1, 2025 and the date OFR issues a decision regarding your license application, so long as [EarnIn] provides a timely response to any requests OFR may make for additional information."

102. As discussed *infra* at ¶¶ 139–141, EarnIn met all the requirements set forth in the EWA Statute and was qualified to receive an EWA license at that time, and at all times to the present.

103. On October 8, 2025, three weeks after EarnIn submitted its application for licensure, OFR requested details about EarnIn's EWA activities in Maryland *prior to* the EWA Statute's effective date (October 1, 2025).

104. On November 19, 2025, OFR informed EarnIn for the first time of OFR's position that a consumer lending license had been required since at least August 2023, when OFR issued

the Guidance, and that it was evaluating whether any prior unlicensed activity by EarnIn warranted penalties. And it was four more months until, on March 3, 2026, OFR told EarnIn that the Commissioner believed EarnIn had engaged in unlicensed activity, that the activity was a barrier to licensure for EarnIn, and that the Commissioner would be requesting some form of restitution and penalty for such activity. At the same time, OFR floated that "joint resolution may be possible" with OAG based on shared authority between the two parts of the Maryland government.

105. Prior to these communications in late 2025 and early 2026, OFR had never communicated to EarnIn any type of monetary demand or any findings that OFR had made based on the 2019–2020 Multistate Group investigation or otherwise.

106. Furthermore, despite EarnIn's continued timely compliance with OFR's licensing application requests, OFR has only recently stated that the grant of an EWA license to EarnIn will be contingent on resolving pre-EWA Statute activity in Maryland, including among other things EarnIn paying "restitution" for offering EWA services and soliciting tips all the way back to 2014. This is notwithstanding the fact that EarnIn's pre-EWA Statute operations were based on a good-faith understanding that its *non-recourse* Cash Out product, which is devoid of any customer obligation to repay, is not a loan.

107. Upon information and belief, other EWA providers have received their Maryland consumer loan license from OFR since October 1, 2025, with minor payments to OFR, if any, while OFR holds EarnIn's license in abeyance, conditioning approval on EarnIn's payment of substantial restitution and penalties.

108. Because of the threat of unlawful prosecution, EarnIn felt compelled to temporarily cease operating Cash Out and shift to offering a different product. EarnIn ceased making Cash Out available to new users on or about July 13, 2026, and it started to phase out its Cash Out

product on August 17, 2026 for existing users in Maryland. Instead, it is introducing a new product called Cash Out Link, which is a bank-offered overdraft protection tool that was designed specifically to allow EarnIn to serve customers in Maryland, among other states, in the hopes that Cash Out can return (and EarnIn can resume soliciting tips) if the Court grants EarnIn the relief it is seeking in this suit.

109. EarnIn hopes it can return to offering Cash Out because it believes that Cash Out is a superior product from a user's perspective to Cash Out Link, given that evidence shows that first-time users' wages go up when they use EWA, and workers choose if they pay for the service and if so, how much. With Cash Out Link, by contrast, all users pay. Should the relief that EarnIn seeks in this lawsuit be granted, EarnIn intends to resume offering Cash Out to Maryland workers and also to resume soliciting tips from Maryland users of its service in the same way that it does in other states without the ban on solicitation.

## CLAIMS FOR RELIEF

### Count I

Maryland's Prohibition on Soliciting Tips Violates the First Amendment
(42 U.S.C. § 1983; U.S. Const. amend. I)

### A. Maryland's Ban on Soliciting Tips is an Impermissible Content and Speaker-Based Regulation of Speech Which Fails Strict Scrutiny

110. EarnIn repeats and incorporates its prior allegations.

111. 42 U.S.C. § 1983 provides that any person who, under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution and laws of the United States shall be liable to the party injured. Defendants act under color of state law in their official capacities. EarnIn has a constitutionally protected interest in the exercise of its free speech rights, including soliciting tips.

112. EarnIn's solicitation of tips is constitutionally protected speech.

113. SB 94's ban on EarnIn's speech—and SB 94's concomitant compulsion that EarnIn expressly disclaim the solicitation of tips or retention of any tips received—violates the First Amendment. That is, SB 94 is unconstitutional in mandating that EWA providers "may not . . . solicit or charge a tip" and mandating that EWA providers state "the provider is prohibited by law from soliciting or retaining tips, gratuities, or other donations." Md. Code Ann., Com. Law §§ 12-1504(2), 12-1503(a)(9) (eff. Oct. 1, 2026); *id.* §§ 12-128(a), (d), 12-318(a), (d).[41]

114. SB 94 is both a speaker-based and content-based restriction on speech and compulsion of speech that is subject to strict scrutiny. SB 94 cannot survive strict scrutiny.

115. SB 94 is a speaker-based regulation because it does not ban all tip solicitations by all speakers. The law was designed to target EWA providers. As enacted, it singles out a specific class of speakers—EWA providers (and lenders)—and prohibits them from engaging in constitutionally protected speech. Other businesses, for-profit and non-profit organizations, and workers, including restaurants, delivery drivers, contractors, and charities remain free to make the same request. That is textbook speaker-based discrimination.

116. In addition to being speaker-based, SB 94 is an impermissible content-based regulation of speech. A regulation of speech is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), or "cannot be 'justified without reference to the content of the regulated speech,' or [was] adopted by the government 'because of disagreement with the message [the

[41] As discussed above in Paragraph 89, EarnIn believes that under Md. Com. Law §12-1502(c), subtitles 1 and 3 do not apply to earned wage access providers and thus §§ 12-128 and 12-318 (which contain bans on lenders accepting tips or giving "a consumer the option to provide a tip") do not apply to it. However, to the extent those provisions do apply to EarnIn, it challenges them on the same First Amendment grounds.

speech] conveys,'" *id*. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). That SB 94 is a content-based regulation of speech is apparent for multiple reasons, including:

a. The law applies only when a company communicates a specific message: a solicitation for a tip to support the services being offered. A covered company may presumably say many other things to customers—state prices, advertise services, thank customers, ask for ratings, request repeat business, or promote add-ons—but it may not ask for a tip. That means the legal consequence turns on the subject matter and message of the communication.

b. The law cannot be enforced without reference to the content of the communication. To enforce this law, the regulator must ask: Did the company request a tip? Said slightly differently, if a regulator saw a screenshot of an EarnIn checkout screen that said "please pay money [REDACTED]," it could not enforce the law against EarnIn without knowing what was behind the "REDACTED." If it said "as payment for the service," that would be lawful, but "for a voluntary tip" would be unlawful. That inquiry is inherently content based. The same words "Would you like to pay an additional $5?" may be lawful if they refer to a warranty, service upgrade, or delivery fee, but unlawful if they refer to a tip. The statute therefore cannot be applied without identifying the communicative content of the message.

c. The law singles out solicitation related to one context by one type of speaker, while leaving all other solicitations, commercial or otherwise, untouched. Maryland has precisely one law that prohibits soliciting tips, by any party, in any context: SB 94. The law does not seek to prohibit deceptive tip requests,

coercive tip requests, hidden fees, false price advertising, or all requests for supplemental payments. It prohibits only one type of request—tip solicitation. The government has decided that this particular speech is undesirable when delivered by this particular speaker.

d. Because EarnIn's tip solicitation is inherently bound up in communicating the value of its mission, Maryland's law necessarily restricts the communication of that message's content. EarnIn communicates a message each time it solicits a tip: that through voluntary contributions, workers can benefit from an alternative to either predatory payday lenders or financial difficulty. Maryland has signified that it is opposed to this message—indeed, it is opposed to the EWA business model itself. A restriction can be content-based if "adopted . . . because of disagreement with the message [the speech] conveys." *Ward*, 491 U.S. at 791.

117. "As a general rule, . . . 'content-based' restrictions trigger 'strict scrutiny,' a demanding standard that requires the government to prove its restriction on speech is 'narrowly tailored to serve compelling state interests.' Under that test, it is 'rare that a regulation will ever be permissible.'" *Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (cleaned up).

118. The Maryland General Assembly did not state a compelling interest in banning EWA providers from soliciting tips (or retaining them once received) and Maryland does not have such a compelling interest, especially in singling out tipping only in one kind of business.

119. The availability of less restrictive alternatives—such as disclosure requirements or anti-coercion provisions—similarly demonstrates that this blanket prohibition unnecessarily infringes on constitutional rights when the state's consumer protection goals could be achieved

through narrower means. Indeed, the prior regulatory regime, enacted just one year earlier, already required disclosures ensuring users understood tipping was entirely voluntary. If Maryland's concern is, as it says, to protect vulnerable users who might feel pressured to contribute when they do not want to, requiring disclosures and other anti-coercion methods is plainly sufficient while not imposing a blanket speech prohibition. And Maryland did not give that framework a chance to operate before it abandoned the comprehensive disclosure regime in favor of a blanket ban on soliciting and accepting tips.

**B. Maryland's Ban On Soliciting Tips Also Fails Under Intermediate Scrutiny**

120. In the alternative, SB 94 also would fail under intermediate scrutiny, to the extent the commercial-speech test was deemed to apply here. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). "Under *Central Hudson*, courts apply 'a four-part intermediate scrutiny test' to determine whether a commercial speech restriction is constitutional: '(1) to receive any First Amendment protection, commercial speech must concern lawful activity and not be misleading; (2) the government must assert a substantial government interest to justify its regulation; (3) the regulation must directly advance the governmental interest asserted; and (4) the regulation must not be more extensive than is necessary to serve that interest.'" *Retail Energy Advancement League v. Brown*, 175 F.4th 551, 560 (4th Cir. 2026) (quoting *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 301 (4th Cir. 2009) (cleaned up)). Maryland's law fails this test in multiple respects.

121. First, EarnIn's communications regarding tips are neither false nor misleading. They consistently emphasize that while tips will support EarnIn's mission of providing a low-cost alternative to payday lenders, tips are entirely optional and will not result in any impact on the availability of services to workers—all of which is borne out by actual Maryland customer behavior rather than vague theory.

122. Second, the Maryland General Assembly did not state a substantial interest in banning EWA providers from soliciting tips (or retaining them once received) and acted to ban tips without evaluating whether the consumer protections embedded in the EWA Statute were sufficiently protective of Marylanders. Moreover, Maryland does not have such an interest in light of what the user data shows about customer knowledge and choice-making. Thus, Maryland has no substantial government interest which justifies this blanket ban on soliciting tips.

123. Third, Maryland's law does not directly advance any interest in protecting workers and deprives them of *their* right to free speech. Customer tip behavior reflects the customer's choice to show appreciation and to support a free or more affordable method for accessing liquidity than more costly alternatives like bank overdrafts or payday lenders. Over the years, EarnIn expressly told customers that optional tips help make no-cost Cash Out possible, and Maryland revenue data confirms that voluntary tips were a meaningful part of the Cash Out model. In Maryland, tips were the sole Cash Out revenue source for EarnIn before 2021, and Maryland customers regularly varied their tipping behavior, clearly demonstrating understanding of the voluntary nature of tipping. EarnIn's customer-facing disclosures accordingly stated: "Optional tips make that possible," "Tips keep us running for millions of members like you," and "Tips go to EarnIn." EarnIn customers understand that their tips—even small tips—support EarnIn's mission and allow free Cash Out services. By depriving the user of a right to tip and punishing innovative alternatives to payday lenders, Maryland leaves its workers worse off. The inability to solicit and accept tips will result in higher Lightning Speed transfer fees for those who choose expedited transfers, may limit competition by targeting direct-to-consumer providers (though the ban is facially neutral as to business model), and unnecessarily limits consumer choice. At worst, it may result in the inability of EarnIn or other direct-to-consumer providers to offer EWA within

Maryland at all, leaving Maryland workers whose employers do not offer the employer-based model with only worse alternatives, like late fees, payday loans, overdraft charges, and so on. Maryland already required a zero-tip default, a per-transaction voluntariness disclosure, a mandatory no-cost option, and a prohibition on conditioning access on tips. Every recognized informational failure was already addressed. SB 94 moved from ensuring the choice is informed to abolishing the choice. Thus, Maryland's law, while purporting to protect workers, harms those workers by giving them fewer and worse alternatives.

124. Fourth, Maryland's law sweeps far more extensively than necessary. As evidenced by the existing regulations, there are meaningful and effective means to protect low-income Maryland workers, aside from imposing a blanket ban on speech by a class of speakers disfavored by Maryland's legislature.

**C. The Asserted Prohibition on EWA Providers Accepting Tips is an Unconstitutional Blanket Prohibition on EWA Users' Expressive Conduct.**

125. SB 94 also violates the First Amendment rights of EarnIn's users because it amends § 12-1503(a)(9) to require EWA providers to conspicuously disclose that they are prohibited from retaining tips.[42] That ban on accepting tips deprives users' tips of the communicative content of that expressive conduct.

126. Tipping constitutes protected expressive conduct because it indicates "[a]n intent to convey a particularized message" and "in the surrounding circumstances[,] the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–11 (1974). For example, a customer who leaves a tip at a restaurant does not merely

[42] SB 94 also amends §§ 12-128(a) and 12-318(a) to prohibit the acceptance of users' tips. As stated above, *supra* at ¶ 116 n.41, based on its understanding of Md. Com. Law § 12-1502(c), EarnIn does not believe that Maryland Commercial Law Title 12, Subtitles 1 or 3 apply to EWA providers, including § 12-128 and § 12-318. To the extent these provisions apply to EarnIn, it challenges them on the same First Amendment grounds.

transfer money; the customer deliberately communicates a message—be it gratitude, approval, dissatisfaction, solidarity, or protest. The size and presence of the tip are chosen precisely because of what they say about the service, the worker, or the customer's values.

127. The communicative meaning of tipping is also readily understood by its intended audience. In ordinary social practice, servers, bartenders, drivers, delivery workers, hotel staff, and customers understand that a generous tip conveys appreciation or approval, while a nominal tip or no tip may communicate displeasure. That message need not be reducible to a single verbal formulation. The First Amendment protects symbolic conduct where its expressive meaning is apparent in context. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (flag burning). The meaning of a tip in the EWA context is even stronger than in ordinary tipping contexts because EWA providers like EarnIn indicate the message that a tip signifies through EarnIn's speech in soliciting the tip: support for others' access to the same EWA platform the worker benefits from.

128. And a tip by its very nature is discretionary, individualized, and evaluative. Its expressive character lies in the customer's choice whether to tip, whom to tip, and how much to tip. That discretion gives the act its communicative content. A mandatory charge may simply allocate compensation, but a voluntary tip communicates the customer's own judgment, gratitude, or disapproval to a particular recipient.

129. The Supreme Court has thus recognized that financial transfers may carry expressive and associational meaning. For example, a political contribution involves "symbolic expression of support," even though the amount of the contribution may provide only a "rough index" of the intensity of that support. *Buckley v. Valeo*, 424 U.S. 1, 21 (1976).

130. Tipping is especially expressive because it is direct communication to an identified recipient. The customer is the speaker, the person or entity providing the service is the audience,

and the gratuity is the message-bearing act. A regulation that prohibits voluntary tips therefore does more than regulate a wage mechanism; it burdens a conventional channel of personal expression. At a minimum, where the government regulates tipping in a way that targets or substantially interferes with that communicative function, the regulation should be assessed as a restriction on expressive conduct rather than as a purely economic rule.

131. "As a vendor with standing to challenge the lawfulness of" Maryland's law, EarnIn "is entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should [its] constitutional challenge fail and the statutes remain in force." *Craig v. Boren*, 429 U.S. 190, 195 (1976) (citations omitted); *see also Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020), as amended (Aug. 31, 2020) (collecting cases). EarnIn thus may assert the free speech rights of its customers which Maryland's law unconstitutionally violates.

**Count II**
Maryland Violates Procedural Due Process
By Refusing To License EarnIn Unless It Pays Retroactive Monetary Penalties
(42 U.S.C. § 1983; U.S. Const. amend. XIV)

132. EarnIn repeats and incorporates its prior allegations.

133. After the passage of the EWA Statute, EarnIn submitted a complete application for a lending license on September 17, 2025. Even though EarnIn satisfied all the statutory criteria for obtaining a license, and even though OFR is *required* by statute to license all qualified applicants within 60 days, Md. Code, Fin. Insts. § 11-207(b), (c), OFR has delayed granting EarnIn a license for over a year. And OFR refuses to issue a license unless EarnIn pays millions of dollars in so-called restitution and monetary penalties for EarnIn's supposed failure to obtain a license for over 10 years before 2025 and over 6 years since OFR's first investigation of EarnIn—something it had no obligation to do prior to the passage of the EWA statute. Holding EarnIn's license for

ransom unless EarnIn pays unlawful and retroactive monetary penalties violates the Due Process Clause and imposes an unconstitutional condition.

**A. Procedural Due Process**

134. An injured party is entitled to damages and injunctive relief if a person acting under color of state law violates any rights, privileges, or immunities secured by the U.S. Constitution. 42 U.S.C. § 1983.

135. Defendants operate under color of state law in their official capacities.

136. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

137. A plaintiff establishes a due process violation by proving (1) that he has "a constitutionally cognizable life, liberty, or property interest," (2) that state action "depriv[ed]" him "of that interest," and (3) that "the procedures employed were constitutionally inadequate." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (cleaned up). A party has a property interest in a government benefit if he has a "legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

138. A private party is entitled to a government benefit if a statute dictates that "administrators . . . *shall*" award benefits where applicants meet "certain particularized eligibility criteria." *Mallette v. Arlington Cnty. Empls.' Supp. Retirement Sys. II*, 91 F.3d 630, 635 (4th Cir. 1996) (emphasis added).

139. Maryland entitles applicants like EarnIn to a lending license if they meet particularized criteria. To qualify for a lending license, an applicant must satisfy OFR that "[t]he applicant has at least $20,000 in liquid assets available to be used in the business to be covered by the license," "[t]he business will promote the convenience and advantage of the community in

which the place of business will be located," and "the [entity's] owners, officers, directors, or members have sufficient experience, character, financial responsibility, and general fitness to: (i) [c]ommand the confidence of the public; and (ii) [w]arrant the belief that the business will be operated lawfully, honestly, fairly, and efficiently." Md. Code, Fin. Insts., § 11-205. An applicant must also post a surety bond. *See id.* § 11-206(c). "The Commissioner [of OFR] *shall* issue a license to any applicant who meets the requirements of this subtitle." *Id.* § 11-207(c) (emphasis added).

140. As detailed in EarnIn's license application, EarnIn has $20,000 in liquid assets, plainly promotes the advantage and welfare of Marylanders, and its officers and directors have the character and fitness necessary to command public confidence and assure OFR that it will operate lawfully and fairly.

141. Despite EarnIn's submitting a complete application on September 17, 2025, demonstrating its entitlement to a license, and even though state law requires OFR to "approve or deny each application for a license within 60 days after the date on which the complete application is filed, the fees are paid, and the surety bond is filed," Md. Code, Fin. Insts. § 11-207(b), OFR has refused to grant EarnIn a lending license under the EWA law. In the same time period, OFR has granted licenses to other EWA providers pursuant to the EWA Statute.

142. Instead of granting a license, OFR has held EarnIn's license application hostage as leverage in Defendants' attempt to use the informal Guidance to retroactively regulate direct-to-consumer EWA products and penalize unsuspecting EWA providers. Specifically, OFR has threatened to impose "restitution" and civil money penalties on EarnIn for its provision of Cash Out disbursements.

143. Withholding a license unless EarnIn pays exorbitant penalties constitutes a deprivation of EarnIn's right to a license.

144. EarnIn also has a constitutional liberty interest in conducting lawful business in Maryland. Thus, "excluding a person from an occupation by denying that person a license for practicing that occupation is clearly actionable" under the Due Process Clause. *Phillips v. Vandygriff*, 711 F.2d 1217, 1222–23 (5th Cir. 1983) (citing *Schware v. Bd. of Bar Examiners*, 353 U.S. 232 (1957)). Because OFR continues to deny EarnIn a license, it threatens to prospectively limit EarnIn from conducting its business activities or be excluded from conducting its enterprise in the state.

145. OFR is depriving EarnIn of its license and threatening to terminate its ability to conduct lawful business in Maryland based on woefully inadequate process. "At a minimum, the Constitution requires notice and some opportunity to be heard." *Mallette*, 91 F.3d at 640.

146. The *sole* basis for OFR's refusal to grant EarnIn a license is its determination that EarnIn must first pay restitution and penalties for pre-EWA Statute conduct—conduct that was lawful when undertaken, was fully known to OFR at the time and that OFR never indicated was illegal, and has never been formally adjudicated through any proceeding where EarnIn was given an opportunity to contest OFR's determination.

147. EarnIn accordingly had no notice that it would be penalized for offering Cash Out and other products in Maryland without a lending license for more than 10 years before the enactment of the EWA Statute and the more than 6 years since its first investigation of EarnIn.

a. No legally binding directive before the EWA Statute required EarnIn to seek licensure. Until the 2025 EWA Statute, EWA providers like EarnIn were not required by the MCLL to obtain a lending license.

b. Although OFR's 2023 Guidance indicated that EWA providers *may* be required to obtain a license based on the specific mechanics of their business, that directive was non-binding guidance that was not subject to notice and comment. Furthermore, EarnIn met with Maryland officials three times between 2023 and 2025, and at no point did OFR indicate that EarnIn was required to obtain a license based on the unique facts of its business.

c. Only on November 19, 2025—after EarnIn had already submitted its license application—did OFR indicate that EarnIn was required to obtain a license under the pre-amendment version of the MCLL.

d. No statute, rule, or informal OFR communications indicated that EarnIn could not obtain a license unless it paid penalties for prior allegedly unlawful conduct.

148. EarnIn has also been deprived of any meaningful opportunity to be heard before facing these penalties.

a. EarnIn was not permitted an opportunity to protest the 2023 Guidance indicating that it might need to register as a lender because that Guidance was issued without notice-and-comment rulemaking.

b. EarnIn also cannot meaningfully contest the imposition of retroactive penalties because they are being assessed as a condition of receiving a license, not in a formal enforcement proceeding.

149. EarnIn also has been arbitrarily held to different standards than other EWA providers. Since September 2025, OFR has granted lending licenses to other similarly situated EWA providers—whether such providers allowed tipping or not—without any reasoned explanation.

150. Withholding EarnIn's license without notice or opportunity to be heard—and conditioned on unlawful exactions—violates the procedural guarantees of the Due Process Clause.

**B. Unconstitutional Condition**

151. Even if EarnIn enjoys no constitutionally protected interests under the Due Process Clause, Maryland cannot condition a government benefit on an unconstitutional condition.

152. The government may not "condition[]" the "conferral of [a] benefit . . . on the surrender of a constitutional right." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996). Even if the government has no obligation to provide a benefit, "a state may not induce … private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (cleaned up).

153. Here, notwithstanding that the Maryland General Assembly's Department of Legislative Services stated in 2024 that "there is no direct federal or State law on the topic of earned wage access" (*see supra* at ¶ 65), OFR has conditioned the conferral of a benefit (a lending license) on the surrender of EarnIn's constitutional right to be free from unconstitutionally retroactive punishments—here, OFR claiming that tips have *never* been allowed and that EarnIn should have been licensed when it first offered Cash Outs over 10 years ago. "The Due Process Clause limits the extent to which the Government may retroactively alter the legal consequences of an entity's or person's past conduct." *PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016) (Kavanaugh, J.), *vacated on reh'g en banc on other grounds*, 881 F.3d 75 (D.C. Cir. 2018). An agency "violate[s] due process by retroactively applying its changed interpretation to [a plaintiff's] past conduct and requiring [plaintiff] to pay … million[s] for that conduct." *Id.* at 48.

154. OFR could not seek civil penalties in an enforcement action against EarnIn for pre-2025 conduct without running into the Due Process Clause's anti-retroactivity rule and could not seek civil penalties in an enforcement action specific to tipping engaged in before October 1, 2026.

155. The unconstitutional conditions doctrine prevents the state from doing indirectly what it cannot do directly. Because OFR cannot constitutionally punish EarnIn for operating without a license before 2025 (when the EWA Statute became operative) or for accepting tips before October 1, 2026 (assuming the tip ban is constitutional, which it is not), it cannot constitutionally condition the benefit of a lending license on EarnIn's paying those same retroactive penalties.

**Count III**
Declaratory Judgment: EarnIn Did Not Violate the Pre-Amendment MCLL
(28 U.S.C. §§ 2201–02)

156. EarnIn repeats and incorporates its prior allegations.

157. The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, authorizes this Court to declare the rights and legal relations of parties to an actual controversy within its jurisdiction.

158. OFR's insistence that EarnIn violated the MCLL prior to the effective date of the EWA Statute by operating without a lending license is erroneous as a matter of law: EarnIn's Cash Out product is not a "loan" *as that term was previously defined in the MCLL*, and the tips and fees EarnIn received are not "interest." This Court should issue a declaratory judgment to that effect.

**A. Cash Outs Were Not "Loans" Under the MCLL Pre-2025**

159. Both before and after the effective date of HB 1294, the MCLL applied to a person engaging "in the business of making *loans*." Md. Code Ann., Com. Law § 12-302 (2019) (emphasis added). The statute defines "loan" as "any loan or advance of money or credit subject to this subtitle." Md. Code Ann., Com. Law § 12-301(f)(1).

160. Cash Out does not satisfy the statutory elements required to trigger application of the MCLL in effect prior to the effective date of HB 1294 ("Pre-Amendment MCLL").

161. First and foremost, EarnIn's Cash Out product lacks the essential characteristic of a "loan" under Maryland law: a legally enforceable obligation to repay. The Pre-Amendment

MCLL reflects that an obligation to repay is the hallmark of a "loan," as it required lenders to mark documents constituting "evidence of obligation of the borrower" as "paid" or "cancelled" upon repayment. Md. Code Ann., Com. Law § 12-308(d)(1)(i) (2018). But with EarnIn's Cash Out, there is no agreement obligating the customer to repay under any circumstance, no "evidence of obligation" to mark paid or cancelled, and no forum in which EarnIn could enforce repayment. EarnIn itself expressly warrants in its Cash Out User Agreement with its customers that it has "no legal or contractual claim or remedy" against a customer who fails to repay. *See supra* ¶¶ 7, 47.

162. Second, a Cash Out is not an "advance" because it can be disbursed without consideration. Customers may access their earned wages without providing any consideration, or any act, forbearance, or return promise.

163. Moreover, Cash Out disbursements lack every other traditional loan characteristic: there is no interest or mandatory finance charge, no credit check, no adverse credit reporting, no debt collection, no late fees, and no rollover debt.

164. EarnIn acknowledges that, after HB 1294 took effect on October 1, 2025, EWA was expressly included within the statutory definition of "loan," subject to Subtitle 15, notwithstanding the absence of essential characteristics of a "loan." But because a Cash Out is not a "loan" or "advance" of money or credit under the Pre-Amendment MCLL, EarnIn was not engaged in the business of making loans under the Pre-Amendment MCLL, as there was no obligation to repay a Cash Out and Cash Outs lacked other essential characteristics—EarnIn did not (and does not) underwrite credit risk, assess creditworthiness, charge time-based or risk-based pricing, or engage in debt collection.

165. Applying the Pre-Amendment MCLL to Cash Outs would serve no cognizable consumer protection purpose. The primary Pre-Amendment MCLL remedy is rendering violative loans unenforceable, but that describes the natural state of a Cash Out.

166. Because EarnIn's Cash Out product fails each of these statutory elements, the Pre-Amendment MCLL does not apply as a matter of law.

167. EarnIn is entitled to a declaration that its Cash Out product did not constitute a "loan" or "advance of money or credit" subject to the MCLL in effect from January 1, 2013 through September 30, 2025, and that EarnIn was not, at that time, required to obtain a Maryland lending license in connection with offering its Cash Out product to Maryland workers.

**B. Tips and Fees Are Not "Interest"**

168. The Pre-Amendment MCLL defines "interest" as "any compensation directly or indirectly imposed by a lender for the extension of credit for the use or forbearance of money." Md. Code, Com. Law, § 12-101(e).

169. Even assuming Cash Out disbursements were deemed loans, voluntary tips and optional expedited transfer fees are not "interest" for three independent reasons:

a. *Tips and transfer fees are not "imposed."* EarnIn has never required payment of any tip or expedited transfer fee as a condition of receiving a Cash Out.[43] A charge voluntarily elected by the customer cannot be "imposed" by EarnIn. As demonstrated by EarnIn's customer usage data, many users choose $0 tips, vary their tip amounts across transactions, and selectively opt into or out of expedited transfer fees, *see supra* ¶¶ 61–63, confirming that these charges are not required or imposed as a condition of receiving funds.

[43] EarnIn removed the tipping experience for Maryland customers in 2025.

b. *Tips and transfer fees are not "compensation" for the extension of credit.* Tips and fees are not consideration inducing EarnIn to provide Cash Outs or paid by the customer in exchange for the Cash Out. Customers who have never tipped receive the same Cash Out product as tipping customers. Expedited transfer fees only relate to payment for an optional method to accelerate delivery of disbursement, and are not a fee for obtaining or accessing a Cash Out. Tips and fees are also not paid in exchange for a particular service (here, a Cash Out); EarnIn expressly solicits tips to help keep its low-cost business running. *See supra* ¶¶ 34–59.

c. *Treating tips and expedited transfer fees as "interest" is inconsistent with and contrary to federal law*. The CFPB has determined that voluntary tips are not "finance charges" under Regulation Z. 12 C.F.R. § 1026.4(a); *see supra* ¶ 29. The Guidance's characterization of tips as potential "interest" conflicts with the CFPB's authoritative determination, which reflects Congress's judgment about which charges constitute "compensation" for the extension of credit under federal consumer financial law.

170. EarnIn is entitled to a declaration that voluntary tips and optional expedited transfer fees did not constitute "interest" under the pre-Amendment MCLL or related Maryland consumer credit laws.

**C. OFR's 2023 Guidance to the Contrary Lacks the Force of Law**

171. The Guidance is an informal industry advisory not promulgated through MAPA's notice-and-comment rulemaking procedures. *See* Md. Code Ann., State Gov't §§ 10-101 *et seq.* As such, it does not carry the force of law and cannot create new legal obligations, expand the scope of existing statutes, or serve as the basis for enforcement action against regulated parties.

172. To the extent the Guidance purports to impose licensing obligations on EarnIn—rather than merely describing existing, unambiguous law—it constitutes a "regulation" requiring compliance with MAPA's rulemaking procedures. Because those procedures were not followed, the Guidance is without the force of law and cannot serve as the legal basis for licensing requirements or enforcement action. *See* Md. Code Ann., State Gov't § 10-125. Accordingly, Defendants may not rely on the Guidance—whether directly or indirectly—as a basis to impose liability, deny licensure, or threaten enforcement against EarnIn.

173. Because the Guidance lacks the force of law, any attempt to impose liability, deny licensure, or threaten enforcement based on the interpretations set forth in the Guidance is unlawful. OFR's threatened enforcement—premised on informal, non-binding guidance rather than duly promulgated law—cannot stand and must be enjoined.

174. EarnIn is entitled to a declaration that the Guidance lacks the force of law and was contrary to then-existing Maryland law.

## PRAYER FOR RELIEF

EarnIn respectfully requests this Court enter judgment declaring that:

a. Md. Code Ann., Com. Law §§ 12-128(a), 12-318(a), 12-1504(2) (eff. Oct. 1, 2026), to the extent it prohibits EarnIn from "solicit[ing] or charg[ing]" voluntary, non-mandatory tips from Maryland customers, violates the First Amendment of the U.S. Constitution as applied to EarnIn, and Defendants are enjoined from enforcing that provision against EarnIn; and

b. Md. Code Ann., Com. Law §§ 12-128(d), 12-318(d), 12-1503(a)(9) (eff. Oct. 1, 2026), to the extent it compels EarnIn to disclose in its service contracts with Maryland customers that EarnIn is "prohibited by law from soliciting or retaining

tips, gratuities, or other donations," violates the First Amendment of the United States Constitution as applied to EarnIn, and Defendants are enjoined from enforcing that provision against EarnIn; and

c. Md. Code Ann., Com. Law §§ 12-128(a), 12-318(a), 12-1503(a)(9), 12-1504(2) (eff. Oct. 1, 2026), to the extent they prohibit EarnIn from soliciting or accepting tips from its customers, violate the First Amendment of the U.S. Constitution as applied to EarnIn and EarnIn's Maryland customers, and Defendants are enjoined from enforcing that provision against EarnIn; and

d. Defendants' threatened retroactive enforcement of the MCLL against EarnIn's pre-EWA-Statute activities violates the procedural due process requirements of the Fourteenth Amendment's Due Process Clause; Defendants are enjoined from such retroactive enforcement; and OFR is compelled to grant the license to which EarnIn is entitled; and

e. EarnIn's Cash Out product did not constitute a "loan" or "advance of money or credit" subject to the MCLL in effect from on or about January 1, 2013, through September 30, 2025, and that EarnIn was not, during that time, required to obtain a Maryland lending license in connection with offering its Cash Out product to Maryland customers; voluntary tips and optional expedited transfer fees did not constitute "interest" under the Pre-Amendment MCLL or related Maryland consumer credit laws; and the Guidance lacks the force of law and cannot serve as the legal basis for licensing requirements or enforcement action; and

f. EarnIn is entitled to such further declaratory and injunctive relief as may be necessary to prevent Defendants from imposing penalties, withholding licensure,

or otherwise sanctioning EarnIn for engaging in truthful, non-misleading speech regarding voluntary tips.

Dated: October 20, 2026

Respectfully submitted,

*/s/ Ryan T. Scarborough*

Ryan T. Scarborough (Bar No. 16161)
Stephen J. Fuzesi (Bar No. 21612)
Jesse Smallwood (*pro hac vice pending*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Tel: 202-434-5000
rscarborough@wc.com
sfuzesi@wc.com
jsmallwood@wc.com

*Counsel for Plaintiff*